In the case 119-12-16-17, Air Wisconsin Airlines Corp. v. The Workers' Compensation Commission Counsel, you may proceed. May it please the Court, Counsel. My name is Mark Liz and I represent Air Wisconsin in this case. It's a very convoluted case. There were originally six cases consolidated together. In this case, this appeal only involves two of those cases. It involves the first, the day of accident, May 13, 2007, when the employee injured his left knee. He eventually came under the care of Dr. Rohde in September and then he was diagnosed with a meniscus tear. The surgery was performed on October 16, 2007. He was taken off work by Dr. Rohde. There's an off work set. The first one is October 24, 2007. And he was allowed to return to work full duty November 28, 2007. Dr. Rohde did testify at his deposition that the employee had reached the status of maximum medical improvement of his left knee by April 2008. We do have two. The employee testified to two intervening accidents, one on July 9, 2009, when he injured his left knee, and one on February 11, 2010, when he injured his left knee. The employee continued to work for the employer through February 11, 2010, at which time he injured his right knee, which is the subject of the second appeal in this case. That case involved a tear of the posterior horn of the meniscus of the right knee. He was taken off work from March 10, 2010, through August 4, 2010, and again September 8, 2010, through February 10, 2011. And he had surgery on the right knee on September 16, 2010. The employee testified that he had an excellent result from that surgery. He was offered a sedentary position on February 2, 2011, which he declined. And after that, there's some changes to also Dr. Rohde, noting he had started some fluid buildup, weight gain, and which was eventually called lymphedema, and he was going for lymphedema treatment. He continued seeing Dr. Rohde, testified that he saw him through January 12, 2015, at which time he found him at maximum medical improvement, though he did continue treating him in subsequent years. The first point is that the commission decision in the first case from the May 13, 2007 accidents against the manifest weight of the evidence. The employee returned to work full duty and was so done by a treating doctor in November 28, 2007. He continued to work full duty. Yes, he did that, but their position is going to be, I suspect, is that Dr. Rohde continued to treat the claimant's left leg condition after that. Mr. Polos, in September of 2015, Dr. Rohde testified he continued to provide ongoing treatment for the claimant's left leg. And that is connected to work accidents. So he's going to say he returned, but he continued the treatment. So what's your response to that? He found him at maximum medical improvement on April 2008. It's on page 694 of the transfer. Didn't he testify that the injury that he suffered while working on July the 9th, 2009, aggravated his left leg condition, causing increased pain and swelling? Right. That's what I'm saying. We have an intervening accident that's increased the leg pain, which is not part of even one of these two appeals. Wait a minute. But his leg condition is a part of this appeal. And if falling down on July the 9th aggravated it, it had to have a condition to be aggravated. Correct. But there's also, was it a temporary aggravation or permanent aggravation? If it's a permanent aggravation, that case would be part of this appeal before this Court. The question is, what is related to the accident of May 13, 2007, not July 2009? Of the six cases, there's only two before this Court. Isn't the aggravation of a preexisting injury compensable, though? Yes, it is. And he filed a claim on that. And the arbitrator made it a law, issued a decision, which was not appealed by either party. So the question goes back to this prior claim, what's related to that prior claim at the time, six, seven, eight years after that intervening accident? Because this case, I believe, was heard in 2017, 2018? So you've got, we're 10 years from 2007, we're eight years from 2009. Then left knee, what's related to 2009, 2007, when the only case we're looking at is what's related to 2007? Now, let me ask this. You also objected to the TTT benefits awarded to the claimant from the period from October 16th, 2007, through October 23rd, correct? Yes, Judge. Didn't he have surgery on his left knee on October 16th, 2007? He did. But would it take, would you have to be a rocket scientist to figure out if you have an operation, you can't work for the next six days? Right. Well, don't we need a doctor? Can we presume to take you off work? Don't we need a doctor taking you off work? Don't we need a doctor, M.D., a D.O. saying you can't work? He's under the knife on October 16th. In an operation. Okay. You're talking about six days out of how many days total? How much TTT did he get total? Six and some weeks. Yeah. And you're talking about six days immediately following an operation. Okay. The biggest claim is the second claim, the February 2010 incident, February 11th, 2010, because that's the case where there's no question Clay tore his meniscus. He had surgery. He was seen by Dr. Neal for an IME, and he said, I had a phenomenal recovery. I was 100% recovered. I was fantastic for three months. So the question becomes, after that, what is the condition of ill-being that Clay suffers from? And that's basically lymphedema. There's a question of whether that lymphedema is related to that accident of February 11th, 2010. The arbitrator found that it was, based on, well, I'm speaking a little out of turn here, because the commission decision and the arbitrator's decision in these two cases do not contain the arbitrator's findings of fact and conclusions of law. Those are attached only to one decision, so I'm going off that. The arbitrator did consolidate the cases, but for some reason he didn't staple those to all the other decisions needed by the commission. No, it was the right knee that was injured on February 11th, 2010, correct? The right knee was the major injury. There was also some injury to the left knee. But the torn meniscus on the right knee was torn on that day. Dr. Rohde performed surgery, and he treated with Dr. Rohde through February 2011. He's going well. Everything's going good. When he sees Dr. Neal for his IME, he says, After the surgery, I was 100 percent phenomenal recovery. Dr. Neal said if the lymphedema was going to be related, it would be limited to the area that was injured and operated on, whereas the employee was suffering from lymphedema through his entire body, all four limbs and his entire body, and Dr. Neal was of the opinion that was impossible. I believe that was his words. Dr. Neal testified a claimant had reached MMI for his right knee, meniscal tear, as of June 14th, 2012. Yes. However, when deposed on September 25th, 2015, Dr. Rohde's notes reflected that he continued to treat the claimant for the right knee symptoms through the 2012 and ongoing basis until the arbitration hearing. So isn't there a conflict in the medical testimony? Well, there is, but at one point, Dr. – and I'm looking just for the site to it – Dr. Rohde did find him at maximum medical improvement, I thought, from that injury, because he said if it wasn't for the lymphedema and the weight gain, he could return to work from the meniscus tear. So he did say that the only thing keeping him, in his opinion, the lymphedema was the major problem, and it is our position that that is not related to either the accident of February 2010 or the surgery. But you would agree that determination of when somebody reaches MMI is a question of fact for the commission to decide, correct? Correct. And – but there has to be some basis for that. And I think – I wish I got some notes here. I thought – and I'll defer to you. I bet Dr. Rohde did testify to that. And there was a question of when he became in maximum medical improvement. So that was January 12, 2015 is when he found him and he testified he was in maximum medical improvement. January – page 1575, Dr. Rohde says January 12, 2015, he found him in a maximum medical improvement. So our position is that the lymphedema is not related to this incident, that the employee told Dr. Neal that before this, he was using compression stockings for bilateral lymphedema. And he used that word, lymphedema. So that's – it appears that he was treating for that. Someone had told him to use compression stockings for that condition. And Dr. Rohde said if he was treating for lymphedema before this, he would find that it would change his opinions. So it is our position that he had this condition before and that would change Dr. Rohde's opinion. So changing Dr. Rohde's opinion, we don't know what it would be. We have to rely on Dr. Neal's opinion, which is that it's not related. Did Rohde justify the post-traumatic changes to the right knee had exacerbated his weight gain in lymphedema? I believe he said that the weight gain – weight gain – that the weight gain is what caused the lymphedema. The lymphedema causes weight gain. So you've got a circular argument there. But didn't he say that the post-traumatic degenerative changes had exacerbated the weight gain and the lymphedema? I thought he gave a list of conditions that would cause lymphedema, and I just want to find it. One was venous stasis. One was weight gain. And I don't remember what the other was, but it was in his testimony as to the conditions he felt would cause this. Oh, Dr. Rohde testified that lymphedema can be caused by weight gain, venous stasis changes, and post-operative blood clots. That was his testimony in his deposition. I read him testifying in his deposition that he opined that the claimant's post-traumatic degenerative changes had exacerbated his weight gain and lymphedema. He had not reached medical improvement. He stated the medical treatment rendered was necessary. I think that would be the opinion if we're talking about lymphedema in the leg, as Dr. Neal said. But we're not. It's the totality of his body. Dr. Neal was of the opinion that he's never seen an injury to a part of the body cause lymphedema in other parts of the body. So that's part of the argument that it might have aggravated in the leg, but Dr. Neal says it wouldn't have. But even if you take what Dr. Rohde said, it should have only aggravated in the one leg, the lymphedema. So our position is that there was some testimony that he had lymphedema before this. It calls into question Dr. Rohde's opinions. When you call into question Dr. Rohde's opinions, you have to rely on Dr. Neal's opinions. And those opinions are that he had a torn meniscus. He had appropriate care for the torn meniscus. He should be awarded permanency based on torn meniscus, not lymphedema and weight gain. And that's our position in this case. Thank you. Thank you, Counsel. You have time in reply. Counsel, you may respond. May it please the Court, good afternoon, Justices, Counsel, Mr. Costello. First of all, I'd like to answer Justice Hoffman's question. Well, you should tell us who you are. Well, my name is Dave Menchetti, and I represent the appellee employee, Thomas Costello, in this matter, Your Honor. And I'd like to answer your question about what Dr. Rohde testified to in his evidence deposition on September 25, 2015. Dr. Rohde testified that he believed that the, quote, post-traumatic degenerative changes exacerbated Costello's constitutional issues, being weight gain and lymphedema. So he did, in fact, testify that the post-traumatic changes, which the traumas here were the two injuries to Mr. Costello's knees, did, in fact, exacerbate the weight gain and the lymphedema. So that, and that's at the record at page 692 in the record in Dr. Rohde's deposition. The appellate employer acknowledges that every single issue it brings up in this appeal is governed by the manifest weight of the evidence standard of review. Despite that, the employer is asking this Court to do what it knows you cannot do under the manifest weight of the evidence standard, and that is asking you to re-weigh the evidence in this case. So what you're saying is there's essentially conflicting medical evidence on all of these issues, isn't there? Yes. On every single issue that is brought up in the employer's brief, the question is, does the manifest weight of the evidence support the conclusions that the Commission came to? This Court — The Commission is the sole judge of the efficacy and weight to be given to the evidence in the testimony, is it not? That is correct, Your Honor. And as this Court has said time and time again, it's not the prerogative of this Court to re-weigh the evidence or to substitute its judgment for the Commission, and it's for the Commission alone to decide which of two conflicting opinions should be accepted. Unless the foundational basis for the opinion was totally flawed. But we don't have that here. Nobody is arguing that, are they? The employer is arguing that the opinions of Dr. Rodi are flawed, but they're wrong when they make that argument. Dr. Rodi certainly said anything is possible, right, like all doctors ultimately do on cross-examination. Anything is possible. But critically in this case, there's no independent medical evidence of some preexisting condition. You can search this record over and over again to look for a page, a single page in a record that contains hundreds of pages of medical documentation. There is no record about whether there was any preexisting medical condition here. The Commission decided it was going to accept the opinions of Dr. Rodi, the physician and the orthopedic expert in this case, who attended and still does attend Mr. Costello over a long and complicated period of medical treatment and over a long and complicated period of recovery. Significantly, Dr. Rodi is the only doctor who saw the progression of Mr. Costello's injuries and his condition from the very beginning until the very end of this process. The Commission was well within its authority to decide that Dr. Rodi was the most persuasive opinion under these circumstances, and this Court simply cannot reweigh that decision. Dr. Rodi did the surgeries in this case. Dr. Rodi prescribed the physical therapy in this case. Dr. Rodi prescribed the medicine in this case. He took long and complicated histories from Mr. Costello. All of that is documented in the medical records, the hundreds of pages of medical records that were introduced in this matter, which in and of themselves would be sufficiently supportive of the Commission's decision under the manifest weight of the evidence standard. But in addition to the records, Dr. Rodi actually testified in this case. He was deposed. He gave very persuasive and succinct direct testimony and furthermore was subject to cross-examination by the Employers' Council. And despite all of that, the Commission chose to believe Dr. Rodi in this case because of those reasons. So if you're inclined to do so, you can compare the evidence that Dr. Rodi gave in this case to the medical evidence that the employer in this case put forward. Regarding the injury to the left knee, which is the first injury in this case, at least as to causal connection, there is no contrary medical opinion by the employer in this case. Both IMEs that the employer engaged in this case came after the second injury, Dr. Cole, on December 20, 2010, and Dr. Neal after that. Regarding the injury to the right knee, the employer's hand-chosen evaluator, Dr. Cole, who I've already mentioned, their own expert, in answer to the question, are the current symptoms and complaints related to the injury reported, quote, the claimant's right knee does remain with unfortunate sequelae related to the inciting incident of a slip, which is the work injury in this case. That's the employer's own expert giving his opinion in this matter. In fact, Dr. Cole goes on to say that it's his opinion that Mr. Costello might need additional surgery to the right knee, that his leg was in such a condition that even Dr. Cole believed that there might need to be some more surgery. So you're saying that work accident aggravated, at the very least, a preexisting condition? Well, no. I mean, Dr. Cole doesn't refer to any preexisting condition. Dr. Cole says the claimant's right knee does remain with the unfortunate sequelae related to the inciting incident of a slip. Unfortunate sequelae. Sequelae means consequences of the injury. That's Dr. Cole, the employer's own expert, giving that opinion. Once it's determined that the commission's findings on causal connection based on the opinions of Dr. Rohde are not contrary to the manifest way to the evidence, the awards for medical treatment, temporary total disability benefits, and permanency benefits simply follow. It'd be impermissible fine-tuning for this court, as already been mentioned, about the six days after the surgery to disturb or alter any of those awards. The awards themselves are supported by the manifest way to the evidence in much the same way that the commission's causal connection determination is through Dr. Rohde's records and through Dr. Rohde's opinions, including the hundreds of pages of records that I've mentioned now more than once. But even, as I've said, Dr. Cole supported the fact that as of the time that Dr. Cole saw Mr. Costello on December 20th, 2010, that he had not reached maximum medical improvement at that time and, in fact, might need additional surgery. The employer acknowledges that all of the awards given by the commission in terms of disability benefits and in terms of permanency benefits are governed by the manifest way of the evidence standard. So the employer is not arguing that once causal connection is determined that Mr. Costello is entitled to no benefits. What they're arguing is that he's not entitled to as many benefits as were awarded to him, that the awards were too big or too long or for too much. Of all the issues to which the manifest way of the evidence standard applies, extent of benefits, whether it's medical, TTD, permanency, would seem to be the most likely to require deference by this Court and affirmation by this Court. When extent of a benefit is involved, there's simply no legal issue to be decided. It's simply a factual issue. In other words, how much or how long seems to be issues that are within the special authority of the commission to decide. And I'd be happy to give examples of how the manifest way of the evidence supports each and every one of those awards, but I'm not going to belabor it any further. So, in fact, at this point, I'm just going to get to my conclusion, which is that the appellee, Thomas Costello, asked this Honorable Court to affirm the order of the decisions of the workers' compensation commission. Thank you for your time. Thank you, Counsel. Counsel, you may reply. Sure. Again, as Justice Hudson brought up, it's not so much conflicting medical. There's no foundation. There's a crack in the foundation of Dr. Rohde's testimony, his opinions, and if there is, and we wouldn't be here without that. What is that crack? That his opinions would change. He's definitely said, my opinions would change if he had been for the EMMA before this accident. So, at that point, there's testimony. He did have one for the EMMA before this. So his testimony, nobody, the counsel didn't ask him, well, what would those opinions be? He just left it out there. So, out there, my opinions would change. Okay. So, I don't think we can rely on that because we've got these other facts. So, there is a crack in his opinion. And so, we're not just conflicting medical, but there's a crack in his foundation, as Justice Hudson pointed out. As to no records for lymphedema, of course, there's no records. We had no discovery. We didn't know we wouldn't be able to get all those records, but he did tell Dr. Neal he had been treating with compression stockings for bilateral lymphedema since before 2007. As to Dr. Cole, he saw him. He said, yes, the syphiloquy, the torn meniscus, that's what we're talking about. And he was off work for a little farther, so the TTD was paid farther. So, it wasn't, you know, Dr. Cole cut him off, we cut him off. He said, yeah, so the TTD continued, and we agreed that it should have continued. So, the sequelae, excuse me, was the torn meniscus, in our opinion, not the lymphedema. Because there's some question when lymphedema did show up, given the records of Dr. Rodey. He notes it sometime after the surgery, after the second surgery, sometime five, six months after the second surgery is his first mention of it. Dr. Rodey. Let me just bring something up. I said, was there a foundational flaw? I don't know that I suggested there was a crack in the foundation, but it's sort of an appealing argument to make. But let me ask you about this. Claimant testified that the swelling in his legs began following the work accidents. Dr. Rodey testified that the claimant's consistent complaints of bilateral knee pain were evidence of post-traumatic degenerative changes that exacerbated his weight gain and lymphedema. Dr. Rodey's records of the claimant's July 5, 2010 visit state, claimant was gaining weight due to his sedentary activity due to his injury. Did he not say that? He did. Well, isn't there providing that, if believed, would provide the causal connection? If due to the work injury, he can't move and the lymphedema is aggravated, why isn't that compensative? Because it's more of a temporal argument that he suffered from lymphedema after the accident, so it's causally related. You could go after the first five accidents, there was no lymphedema. Other than what he was treating for back in 2007, but there's no doctor saying he had it. After the surgery by Dr. Rodey on the right knee, lymphedema doesn't show up for months later. So Dr. Rodey is just saying, well, after the surgery, after the trauma, he had lymphedema, therefore it must be related. Well, let me ask you another final question here. Does the commission's decision have to be supported by expert medical evidence? What if they simply believe a claimant had an issue? Can they do that, even in the face of medical evidence? Can't they do that? Don't say no, because that would be the wrong answer. Let me think about it. Probably they could, yes. Thank you. The basis for their decision has to be conformed to the evidence they've shown, whether it's the testimony of the employee or the doctor. It has to fit there, and I think in this case it's the same. I understand, but sometimes you go back and forth, and experts are hung up on them, and we ignore the claimant's testimony. I think that if you look at the testimony, it goes to the lymphedema was before these accidents. The question is whether it aggravated it, how did it aggravate it, and so well after the traumas and after the surgery. It was after both. So would the trauma have aggravated it? It would have been right after the trauma. It would have been right after the surgery. So that's the other issue. So thank you. Okay. Thank you, Counsel Ball, for your arguments in this matter. It will be taken under advisement and written disposition shall issue.